The CITY OF FORT WORTH, Petitioner,

v.

Harvey G. PIPPEN et al., Respondents.

No. B–1107.

Supreme Court of Texas.

April 2, 1969.

Rehearing Denied May 7, 1969.

S. G. Johndroe, Jr., City Atty., Jerome H. Parker, Jr., Asst. City Atty., Fort Worth, for petitioner.

Richard Owens, Walter S. Fortney, Fort Worth, Robert F. Salmon, Linden, Arthur Lee Moore, Fort Worth, for respondents.

REAVLEY, Justice.

The City of Fort Worth, in acquiring numerous tracts of property for its streets and airport, placed funds in the hands of Rattikin Title Company with instructions for insuring title and closing the transactions with the sellers. The City's land agent, Herman F. Hall, obtained city authorization of one price while making a settlement with the seller to take a lesser amount. The difference Hall obtained from Rattikin Title Company through its vice-president, Harvey G. Pippen. The jury found that Pippen knew of Hall's conversion of the City's money. The trial court decided that neither Pippen nor Rattikin were liable to the City, and entered judgment for the City against only Hall.

The Court of Civil Appeals held both Pippen and Rattikin to be liable but remanded the case in order to allow them to prove an offset to their liability. 430 S.W. 2d 239. We agree with the Court of Civil Appeals on the issues of liability but render judgment here for the City.

These transactions took place in connection with a number of city projects conducted in the years 1959 through 1964. Hall was an experienced and trusted city employee. He negotiated in each instance a price which the landowner would accept for the title or damages to his land. No contract was signed between the City and the landowner, and no other employee of the City knew of the price which the landowner had actually agreed to take. Hall then reported a different agreement to the land department of the City, and a recommendation was put through channels to the City Council to obtain authorization to conclude the trade for the larger sum. The City placed the matter in Rattikin's hands by informing the title company that the City had decided to purchase the certain tract of land, requesting a title policy, and apprising Rattikin that the City's check would shortly be transmitted for the certain consideration. The check would follow with accompanying identification and instructions as to disbursement.

In some cases there were fences, shrubs or buildings which had to be removed from the acquired property. It was the policy of the City always to make the landowner responsible for moving his own improvements and to pay him an agreed sum for this item of damage when the removal was completed. However, Hall violated this policy and said nothing to the landowner about this measure of the consideration. Hall's trade with the landowner, where construction was required, was for a payment for the land together with Hall's promise to see that the construction or moving of improvements was accomplished.

The closing of these transactions and disbursement of the money was under the control of Pippen, who was the vice-president of Rattikin. He would prepare a "seller's statement" which showed the trade as the seller understood it. On the other hand a "purchaser's statement" would be prepared for the City according to the version of the trade in its letter of instructions to Rattikin. The money which did not go to the seller or to a construction company for work actually done, went into the hands of Hall.

After the closing, Pippen would write to the City and transmit the deed, title policy and "purchaser's statement" along with Rattikin's bill for closing costs which included the price of the title insurance and an escrow fee.

The City finally discovered the discrepancies in 1964 and filed this suit in 1965, alleging that in 64 particular transactions, the funds of the City had been deposited with Rattikin as escrow agent and trustee of the City, that the money had been accepted in trust, and that the trust had been violated by wrongful delivery and unauthorized disbursements to Hall. The City sought actual damages of $90,519.69, together with exemplary damages. Trial before a jury began on August 25, 1966, and continued until the verdict was returned on

October 4, 1966. The jury answered 192 special issues, and found that all except four of 92 particular checks were converted by Hall to his own use and benefit. The jury further found that at the time each of these title company checks was issued by Pippen, he knew that Hall was converting the proceeds. Exemplary damages were found against Pippen in the amount of $10,000, but no exemplary damages were assessed against Rattikin.

The City sought a judgment on that verdict of $60,011.20 actual damages against Pippen and Rattikin, together with $10,000 exemplary damages as against Pippen. Hall was also a party defendant and judgment was rendered against him on the verdict, from which he took no appeal. However, the trial court entered judgment n. o. v. in favor of Pippen and Rattikin on August 15, 1967. In the judgment the trial court found as a matter of law that the evidence showed Hall to be the agent of the City with authority to do what he did in connection with the closing of the transactions, and that "after the plaintiff had received its deed and title policy the plaintiff had no further interest or title in the escrowed funds, and so cannot maintain this action for conversion thereof."

The Court of Civil Appeals at first reversed and rendered judgment for the City against Rattikin and Pippen according to the jury verdict, but on rehearing remanded the case for Pippen and Rattikin to have an opportunity to plead and prove, as an offset to their liability, such benefits as the City may have received from the use of the funds by Hall.

All three of these parties applied to this Court for writ of error. The application of the City, contending that judgment should have been rendered for it, was granted. Because that application was granted, the applications of Pippen and Rattikin were also granted.

## LIABILITY OF PIPPEN

Pippen argues first that there is no evidence that he "had any information or any reason to think that money was being embezzled by Hall from the City of Fort Worth." An examination of a few of these transactions will demonstrate why the jury found otherwise.

On November 3, 1959, the City wrote to Rattikin a letter in this customary form: "This is an application for a title policy on Lots 16 and Lot 17, Block 147, Clark's Addition, which the City has agreed to purchase from Mrs. Ora Bell Brooks for a cash consideration of $2,500.00." The City's check to Rattikin for $2,500 is dated November 4, 1959, and carries the notation: "Purchase of Lots 16 & 17, Block 147, Clark's Addition from Ora Bell Brooks." A "purchaser's statement" dated November 9 was prepared by Pippen to report the details of closing to the City. It shows the purchase price as $2,500. The title policy, prepared on Pippen's instructions, was for the same amount of $2,500. But the "seller's statement," which is signed by Mrs. Brooks, shows her amount due as $2,100. The $400 difference, disbursed by Rattikin's check to J. Hall Construction Company for "construction work," is not shown on either statement.

In the case of J. H. Bailey, the City explained that its check for $862.40 was to pay "$191.00 for land; $671.40 for relocation of fences, loss of trees and damages to the remainder." The City's statement shows these figures, but the seller's statement shows only $259 for "damages etc." together with the $191 for land. Bailey testified at the trial that his agreement was for payment of the total $450, as his statement reflected. The difference, $412.40, was paid by Rattikin's check to T. & H. Construction Co. on April 12 for "construction." Bailey said that he knew nothing of T. & H. Construction Co., that no construction was done, and that he had a fence but moved it himself.

C. B. Holden received $300 for damages, but the City paid Rattikin $400 for this purpose. The two statements show those respective amounts, and the $100 left in

Rattikin's hands was paid by it to J. & H. Construction Co. Mrs. Holden testified that there was no construction and no word about J. & H. Construction Co. She also told in these words of an incident at the closing in Pippen's office: "Mr. Holden raised up the first two sheets of paper and was reading at the bottom of the third sheet, when Mr. Pippen reached over and snatched the paper from his hands and told him he wasn't supposed to read it, it was all legal."

The City sent a check for $62,340 to Rattikin for the A. Hall trade with this explanation: "Payment for land is $48,000.00, $8,000.00 for improvements and $6,340.00 for estimated gravel and cancellation of lease agreement with truck farmer." The trade was closed by Pippen on March 21, 1962. He made a closing statement for the City showing the payment of $48,000 plus $14,340 for improvements and gravel. He issued the City a title policy for the $48,000. However, the seller's statement shows payment of only $55,000, as follows: Land $42,000; Improvements $8,000; Gravel $5,000. A. Hall was paid in full on this lesser basis. This left $7,340 in Rattikin's account, which was paid within a month by four checks as follows: $1,000 to M. & H. Construction Company "for moving barn," $3,000 to M. & H. Construction Co. for "construction," $2,000 to A. Hall for "proceeds of sale," and $1,340 to A. Hall for "bal. proceeds of sale." The seller, August Hall, was not related to Herman Hall. A. Hall testified that he sold his land and improvements for $55,000, that he knew nothing of M. & H. Construction Co., and that the two checks to A. Hall dated after the closing were never seen by him.

These transactions were all closed by Pippen; and the checks were drawn, the title policies issued, and the papers prepared according to his direction. The City proved that the checks disbursed in the transactions described above, and all of those checks for which it seeks judgment, went into personal bank accounts of Herman Hall. Even if Hall's deception might explain the discrepancy in one or two transactions, it is inconceivable that Pippen could have been unaware of the irregularities in so many cases over the period of five years without alerting either a seller or the City. He did not contribute one word of warning or assistance to the City, and even testified at the trial that he then retained the "greatest confidence" in Hall. Pippen was a licensed attorney, 61 years old, and had fourteen years experience with Rattikin. The record supports the findings of the jury that Pippen knew that Hall was converting this money to Hall's own use.

Pippen next argues that the City had parted with title to the money when it was sent to Rattikin and is therefore not entitled to complain about its misdirection. The contention is that the checks to Hall's "companies" transmitted money which belonged to the sellers of the land, and only the sellers could then sue for its conversion. Rattikin makes a similar argument, and apparently the trial court accepted it. The landowners have made no claim to these funds, nor could they. Their agreement to sell was at the lesser price, and this they received. They executed the necessary instruments and received the agreed consideration. A disclosure that the City intended to pay them a larger sum would not support a legal claim to the amount which they had "left on the table."

It should be noted that Rattikin did not receive or hold these funds as a true escrow, although that term has been used by the parties. There was no escrow agreement, and Rattikin owed no obligation to the seller with respect to funds which were held by Rattikin while consummation of the settlement and conveyance was being awaited. The City simply sent its funds to Rattikin to be used to acquire the land and to settle the claim of the selling landowners. If these funds were misapplied, it was the City and not the seller who was entitled to sue.

## LIABILITY OF RATTIKIN

 Rattikin strenuously insists that even if its agent was at fault, since the loss is primarily due to the wrongdoing of the City's own agent, the City is entitled to no recovery (or at least no more than half) because of the rule that one principal cannot recover from another principal for the fraud of the agents of both principals. This contention overlooks the fiduciary obligation which Rattikin owed to the City. Rattikin took the City's money to accomplish a purpose directed by the City. Rattikin was paid a fee for its services and for the careful handling of these funds. Rattikin therefore owed the City the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it. Rattikin is liable for the breach of its fiduciary obligation, regardless of the fact that the City received exactly what it intended to buy. Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377 (1945). Furthermore, Rattikin is liable for knowingly participating in Hall's abuse of his fiduciary obligation to the City. Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509 (1942).

Rattikin next argues that the knowledge of Pippen should not be imputed to it, because if Pippen did disburse funds to Hall with knowledge that Hall was to convert them, Pippen was then acting adversely to and in fraud of the principal, Rattikin. While it was not to the interest of Rattikin for Pippen to pay out the funds under those circumstances, the same could usually be said where an agent is guilty of conscious default. It does not necessarily follow that the principal is absolved of liability.

 Rattikin has not undertaken to prove Pippen's motivation as fraudulent collusion between Pippen and Hall, though this would be Rattikin's burden. Steele v. Butler, 227 S.W. 506 (Tex.Civ.App., 1921, no writ). But irrespective of the interest of Pippen, his acts in issuing the checks to

Hall were done as vice-president of the defendant corporation. Pippen was completely in charge of these transactions; he prepared the papers and conducted the closings as the sole representative of Rattikin. Rattikin is thus bound by constructive notice of every material fact involved in the transaction and known to Pippen. Wichita Royalty Co. v. City National Bank of Wichita Falls, 127 Tex. 158, 89 S.W.2d 394, 93 S.W.2d 393 (1935); Wellington Oil Co. v. Maffi, 136 Tex. 201, 150 S.W.2d 60 (1941); Irvine v. Grady, 85 Tex. 120, 19 S.W. 1028 (1892); U. S. F. & G. v. San Diego Bank, 155 S.W.2d 411 (Tex.Civ.App. 1941, error ref'd w. o. m.).

 The emphasis here should be laid on the fiduciary obligation which Rattikin owed to the City. Pippen's failure to disclose the misapplication of these funds resulted in a violation of Rattikin's duty to the City. Under those circumstances Rattikin is bound by the knowledge of Pippen even if Pippen is considered as having acted adversely to Rattikin. Restatement, Second, Agency § 282(2) (a) (see illustrations 6 and 8).

 We therefore conclude that the trial court erred in entering judgment in favor of Pippen and Rattikin. Under the evidence and the findings of the jury, the City was entitled to judgment against them for those funds converted by Hall with the knowledge of Pippen.

## THE ORDER FOR RETRIAL

We now come to the reason for which the applications were granted in this case, which is the City's contention that the judgment should have been rendered by the Court of Civil Appeals without ordering a remand of the case. The only purpose for returning to the trial court is to determine what, if any, offset should be allowed on the liability of Rattikin and Pippen by reason of work that was performed for the benefit of the City with the funds placed in Hall's hands. The City contends that if any offset should have been made (which

it denies), the burden of proof was on the defendants, and no cause is shown for giving them a second chance.

To understand the problem we should look again at the evidence. Construction was required in connection with some of these transactions, and Hall padded the construction costs in the same way that he padded the purchase price on other transactions. For example, Mrs. N. K. Reed testified that her deal with Hall was for the payment to her of $1,240.00 for the land and for the City to move her house. The house was moved by Kuykendall Lumber Company, which was paid $4,297.00 after presenting to Rattikin a signed statement by Mrs. Reed saying that the work had been completed satisfactorily. However, there was an additional check for $1,000.00 made payable to J. & H. Construction Company which was traced to Hall's personal account, and it is this $1,000.00 which the jury has found to have been converted by Hall.

Similarly, C. O. Stephens testified that his trade was for a payment of $820 and relocation of his house. Kuykendall Lumber Company moved the house and Stephens signed a letter to Rattikin advising that the work had been completed satisfactorily. Kuykendall was paid $6,815.93 by Rattikin check. Previously, a check to J. & K. Construction Co. had been issued for $6,000; but to make up the amount needed for the Kuykendall check, Hall gave his personal check to Rattikin for $5,459.90.[1] Hall retained an excess inasmuch as the City had given Rattikin $8,176.23 for the trade, though the landowner and Kuykendall received a total of only $7,636.13.

One of the most revealing transactions was that with F. M. Marsh. The City placed $10,325 in the hands of Rattikin for relocation of residence etc. The trade was closed with the seller on December 22, 1960, when the deed was executed and the seller was paid $1,243 for shrubs etc. Beginning with a small check on the following day, five checks were made by Rattikin to J. & H. Construction Co. over the next year totalling $8,100. On January 3, 1962, with a balance in this particular account of $872, Pippen wrote the First National Bank of Handley to certify that Rattikin was holding $7,745 for payment to Kuykendall Lumber Company when work on this Marsh house was completed. On February 2 Marsh signed a letter of satisfactory completion. On the following day Hall gave his personal check for $7,013 to Rattikin, so that Kuykendall and the named bank could be paid $7,745 on February 5.

After studying this record, we can understand why the jury found that Hall acquired these checks for his own personal use. However, there are six checks which he received in the closing of four transactions (C. W. Porter, H. E. Barham, John W. Fox, and Leonard Arnold) about which there is more uncertainty. The City files contain considerable indication that houses were moved, but no mover was paid unless Hall did the moving or paid whomever did it. Very little land was acquired, and the value of the title policy was only a small part of the consideration. However, there is no testimony as to what actually existed on these tracts or what happened there. There is no reference to construction on the seller's closing statements and no certificate by any of them to Rattikin that work on their property was satisfactorily completed. None of these particular landowners testified at the trial. We have only the files and the proof as to the checks which Hall deposited in his personal accounts. The seller signed nothing indicating the relocation of improvements, and the City has proved the contents of its own files to be suspect. The jury found that the full amount of each of these checks was converted by Hall to his own personal use and benefit. Rattikin and Pippen now say that they can prove that substantial work was done in this connection which was a

---

1. In six transactions Hall obtained an advance from Pippen which Hall later returned by personal check. The total of these checks was $29,693.45.

benefit to the City and for which the City should not recover.

■ Both Hall and Rattikin owed fiduciary duty to the City. Hall was not entitled to any personal gain from whatever he did with these funds.[2] When the City proved a breach of duty on the part of these fiduciaries and the amount of the money that went to Hall, the City made its case. Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509 (1942). The burden then fell on Pippen and Rattikin to show any benefit received by the City which should be offset against its recovery, Wichita Royalty Co. v. City National Bank of Wichita Falls, 127 Tex. 158, 89 S.W.2d 394 (1935); International Bankers Life Insurance Company v. Holloway, 368 S.W.2d 567 (Tex.Sup.1963); Meyers v. Baylor University, 6 S.W.2d 393 (Tex.Civ. App.1928, writ ref'd). Having failed to make this proof at the trial, or to request special issues and obtain findings thereon, Pippen and Rattikin waived this matter. Neither did they raise cross-points in the Court of Civil Appeals under Rule 324, but then they were denied no opportunity in this respect by the trial court and had no error about which to complain. It was only after the Court of Civil Appeals rendered judgment against them that they sought, in their motion for rehearing, a new trial so that an offset might be applied against their liability. Under these circumstances they have no basis to claim a right to a new trial.

## THE ENDS OF JUSTICE

■ On motion for rehearing the Court of Civil Appeals changed its prior judgment and remanded the case under Rule 434 for a retrial of those issues not previously determined. Where the trial court has erred by entering judgment n. o. v. but has otherwise committed no error, a remand is proper only in unusual cases and only for good and sufficient reason shown in the record. Jackson v. Ewton, 411 S.W. 2d 715 (Tex.Sup.1967).

■ The Court of Civil Appeals awarded the retrial because Rattikin and Pippen "won their case upon the theory of law adopted by the trial court but lost it upon the theory of law announced by this appellate court." However, the theory of law of the trial court was not imposed on the defendants so as to restrict their proof or submission to the jury. Having had a verdict returned against them, they persuaded the court to err in their favor. They have no complaint about the theory of law or error of the trial court.

The Court of Civil Appeals then says that "a full consideration of the case necessitates that the pleadings be amended and additional testimony supplied." The trial of this case lasted six full weeks. The record contains the testimony of many witnesses and a huge amount of documentary evidence. The trial court showed considerable patience to the end that all of the parties should have the full opportunity to develop their proof, and none of them were curtailed in this respect. It is conceivable that defendants in the position of Rattikin and Pippen might have preferred a separate trial on liability in order that any evidence as to an offset benefit to the City would not be taken by the jury as an admission of liability. But no request was made by the defendants for a separate trial.

The governing principles of law which were declared above, and which led the Court of Civil Appeals to reverse the trial court, cannot be said to be new. There has been no change in the law during the process of this trial. To the contrary, we are simply looking at traditional law as to fiduciaries.

---

2. Section 17 of Chapter XXVIII of the Charter of the City of Fort Worth provided as follows:

"No officer or employee of the City shall have a financial interest, direct or indirect, in any contract with the City, or be financially interested, directly or indirectly, in the sale to the City of any land, materials, supplies, or services. * * * *"

It has now been almost three years since this case first went to trial, and four years since suit was filed. It involves transactions that go back as far as ten years. In considering the ends of justice, we must consider the City of Fort Worth as well as the problems of judicial administration and the rules of civil procedure. This case has already been expensive to the City and to the courts.

█ It was the order of the Court of Civil Appeals that this cause be remanded "for further proceedings not inconsistent with the opinion of the court." By its opinion that court stated that there would be no necessity for a retrial of issues already determined. In particular, it directed that "no estimate, bid, or bill of record or in the file of the City would constitute evidence that work was done or was necessary to be done in connection with any transaction, nor evidence of the reasonable cost or value of any work done." This was an effort to avoid requiring the City to produce again this mass of evidence to show the pattern of fraud which cast a cloud of suspicion upon the contents of these files. Rattikin complains of the quoted restriction in its application for writ of error here, wherein it says that the contents of these files are relevant and should not be completely excluded from the consideration of the jury. We think that this point is well taken, and the trier of fact should be allowed to consider all relevant matter, even when the issues are restricted. It follows that in a new trial the City would be required to introduce again most of this evidence which took so long to present in 1966, and which was transcribed for purposes of this appeal at a cost of almost $4,000.

Another reason why this case cannot be partially retried is the exemplary damages award, which cannot be divided or partially reconsidered.

We hold that a new trial should not be ordered under Rules 434 or 505 and that judgment must be rendered for the City.

## JUDGMENT

The judgments below are reversed, and judgment is here rendered in behalf of the City of Fort Worth against Harvey G. Pippen and Rattikin Title Company, jointly and severally between them, and as against Herman F. Hall, for actual damages in the amount of $60,011.24, plus 6% per annum interest beginning on June 26, 1967. Additionally, the City of Fort Worth shall recover $10,000 as exemplary damages against Harvey G. Pippen, plus interest similarly computed.