## FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF BEAUMONT, Appellant,

### v.

## STEWART TITLE COMPANY and Stewart Title Guaranty Company, Appellees.

### No. 09–86–212 CV.

Court of Appeals of Texas, Beaumont.

June 11, 1987.

Rehearing Denied July 1, 1987.

Clint C. Small, Small, Craig & Werken-thin, Austin, Thomas J. Sibley, Beaumont, for appellant.

F.L. Benckenstein and Christopher C. Gilmore, Benckenstein, Oxford, Radford & Johnson, Beaumont, for appellees.

## OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a summary judgment.

Appellant's brief begins:

"Appellant, First Federal Savings & Loan Association of Beaumont respectfully submits this brief in support of its appeal of summary judgments entered by the District Court of Jefferson County, 136th Judicial District in causes No. D–121,345 and D–121,345–A, consolidated with D–121,777.

## "STATEMENT OF THE NATURE

## "AND RESULT OF THE CASE

"This is a suit brought as a third-party action by Appellant against Stewart Title Guaranty Company and its subsidiary Stewart Title Company for breach of fiduciary duty, misrepresentation, fraud and negligence arising out of an undertaking by Appellee Stewart Title Company to perform certain services for Appellant. The trial court entered summary judgment in favor of Appellees and this appeal is from such judgment.

*"Point of Error Relied Upon*
"THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT."

First Federal Savings and Loan Association (hereafter First Federal) issued "Construction Loan Closing Instructions" to Stewart Title Company (hereafter Stewart). These instructions were relevant to two different building sites; firstly, Lot 1, Block 2, Briar Creek Subdivision to the City of Beaumont. The second set of instructions was relevant to Lot 31, Block 35, Dowlen West, Section 22, to the City of Beaumont. The instructions were virtually identical, being on printed forms. The borrower in each case was John Tiner Homes, Inc.

We determine that there are ambiguities and inconsistencies within the closing instructions themselves.

Each closing instruction contains this lucid provision:

"You are hereby requested to close this Construction Loan and *issue a Mortgagee's Title Binder in the amount of the Note insuring a first lien to FIRST FEDERAL SAVINGS AND LOAN AS-*

*SOCIATION OF BEAUMONT* and show taxes paid current." (Emphasis added)

The instructions then deal with preparing "legal documents", naming the legal counsel for First Federal who must prepare them. This part of the instructions provides that the "Association's papers, as indicated by (*) in the requirements listed below" will be required. The legal documents, which were characterized as requirements, were:

"Original Promissory Note (Signed and Attested)

"Original Guaranty of Payment of Promissory Note (signed and dated)

"Certified copy of Deed of Trust (Signed and attested)

"Original Certificate Form I or II signed & dated (attached)

"Signed Loan Application (attached)

"Mortgagee's Title Binder

"Slab Survey; Builder's Surveyor is *Stonecipher*

"Original Builders Risk Policy in the amount of the Note ...

. . . .

"Signed & Certified copy of Closing Statement."

We conclude that it is significant that, under the requirements, First Federal did not require the original Note and Deed of Trust to be signed, executed and filed prior to the start of any construction. Also, First Federal left partially blank this provision:

"... We are to make the permanent loan to _____. Our permanent loan commitment is to expire on _____."

On page 2 of the first Closing Instructions, we find, under the heading "COMMENTS":

"The Association has a lien on the subject lot(s); contact the Construction Loan Department for release amount & interest to be collected.

"A Slab Survey is required & if the Builder draws on Slab Survey, we can disburse $27,832.00 on first draw which includes land if applicable. The Builder may call the inspector, *Don Hall, 833–*

*6361,* direct for his subsequent draw inspections."

In the last part of the instructions, it is shown that both an appraisal fee *and an actual inspection fee* are to be collected and used in favor of First Federal. The appraisal fee is $150.00 and the inspection fee is definitely set at $20.00.

As stated above, the second set of closing instructions are virtually the same. However, on page 2 thereof, under "COMMENTS", First Federal does not claim that it has a lien on the subject lot(s), but an appraisal fee of $150.00 *and an inspection fee of $20.00 are required.* If the builder draws on the slab survey, then the disbursement can be in the sum of $45,564.00. We perceive questions of law in construing these written instruments.

### The Question of Visual Inspection

We comment that, if either one of these parties had made an actual inspection of the lots for themselves, as to the actual, physical conditions of the lots in question, this dispute with its resulting litigation would probably have been avoided.

### The Slab Surveys

In each instance, pursuant to the closing instructions, a slab survey, apparently showing a slab had been poured and completed in place on each lot, was obtained. These slab surveys *strongly tended* to reveal that construction had commenced prior to the signing and recording of the Deeds of Trust. In these consolidated cases, it is shown that the slab survey, in one case, was obtained on October 6, 1984, and the loan documents and the requirements were later signed on October 9, 1984. In the other case, the slab survey was obtained on August 24, 1984, and the requirements and the loan documents were signed the same day.

The survey of the slab located at 5390 Timberline Lane, being Lot 1, Block 2, Briar Creek Subdivision, was signed, sworn, and certified to on the 6th day of October, 1984, by Guy A. Stonecipher, Jr. The plat is drawn in considerable detail. Not only does it show a large concrete slab but shows, in addition thereto, *a concrete driveway and a concrete walk apparently in place.*

■ On the other lot, being designated as 6925 Limerick Drive, being Lot 31, Block 35, Dowlen West Addition, Unit XXII, Guy A. Stonecipher, Jr., the registered public surveyor, certified, swore, and subscribed to its plat on the 24th day of August, 1984. That plat is also carefully drawn in considerable detail. It apparently shows in place and in being not only the original concrete slab, but a second concrete slab and a concrete driveway that is longer in length than the main concrete slab. Bear in mind that First Federal *required both of these slab surveys.* Hence, we perceive, under this unusual record, that material fact issues arise, being the dates of visible commencement of the slabs. This material issue of fact may be characterized or described in a fashion somewhat similar to the nationally renowned, famed question that then Senator Howard Baker, a United States Senator from Tennessee, during the Watergate investigation, put (we paraphrase the question):

> "What did the President of the United States know about the Watergate breakin and when did he know it?"

This is not a verbatim quotation. But we must ask ourselves:

> "What did First Federal know about the two concrete slabs whose locations are set out above and when did First Federal know it?"

After all, First Federal did require these slab surveys and, in their requirements, naming and designating the actual surveyor. And, in fairness, we have to ask ourselves:

> "What did the Stewart Title ·Company and the Stewart Title Guaranty Company know about these slabs and when did they know it?"

We decide that a material fact issue exists as to the slabs and as to the times the slabs were visibly commenced and the times when the slabs were completed. The same material fact issue exists as to the other improvements clearly set forth on the

plats. Also, were any bills or claims, on these platted improvements (if they existed), unpaid on the dates of the recordings of the Deeds of Trust?

### The Closing Instructions

We think the ambiguities and inconsistencies in the closing instructions (when construed and considered with the slab surveys) create crucial questions of law.

On August 27, 1984, Stewart Title wrote a letter to First Federal in re: John Tiner Homes, Inc., re: Lot 31, Block 35, Dowlen West, Unit XXII, advising:

"Regarding the above file we enclose the following, per your instructions:

"1. Your Check $1,366.00 (to follow)

"2. Orig[.] Note

"3. Orig. Guaranty of Payment

"4. C. Copy of DT

"5. Orig. Form II

"6. Loan Appl.

"7. Slab Survey

"8. Signed & Cert. Copy of Closing Statement

"9. C. Copy of Binder

"We hope you find the above in order and will issue a check on same.

"Sincerely

[Signed] "Earleen Dumatrait

"Earleen Dumatrait

"Escrow Officer

"enclosures"

Then, on October 9, 1984, Stewart Title wrote a similar letter to First Federal, in re: John Tiner Homes, Inc., on Lot 1, Block 2, Briar Creek Subdivision, advising:

"Regarding the above loan we enclose the following, per your instructions:

"1. Original Note

"2. Orig. Guaranty of Payment

"3. C. Copy of DT

"4. Orig. Certificate Form II

"5. Signed Loan Application

"6. C. Copy of Binder

"7. Slab Survey

"8. C. Copy of closing statement

"We hope you find the above in order and will issue a check on same. We will exchange checks if you will call us when check is ready.

"Sincerely

[Signed] "Earleen Dumatrait

"Earleen Dumatrait

"Escrow Officer

"enclosures"

Hence, shortly after August 27, 1984, and shortly after October 9, 1984, First Federal had in its possession the slab surveys and could have read, studied and considered the same as to the dates of the slab surveys. After these letters of transmittal, including significantly the slab surveys, as well as copies of the title guaranty binders, what did First Federal know, or what should First Federal have known, and when? And the same questions can be posed to Stewart Title and Stewart Title Guaranty Company. Certainly, after the letters of transmittal, First Federal knew that the slabs were probably in place and had actual copies of the slab surveys with the dates when Stonecipher swore to them. A fact issue arises as to whether First Federal should have made inquiries as to whether all the bills for labor and material had been paid on the slabs and other shown improvements. First Federal, at that time, had some evidence that the slabs, and probably other improvements, were in place before each Deed of Trust was recorded; so did Stewart Title.

### The Binder's "SCHEDULE C"

First Federal, likewise, had a certified copy of the binders. The binders contained a "SCHEDULE C". A relevant part of Schedule C read:

"1. Evidence satisfactory to the Company that:

"(a) No materials have been furnished or any labor performed in connection with the construction contemplated here under prior to the execution, acknowledgment and delivery of the lien instrument described under SCHEDULE A hereof, if the land described under SCHEDULE A forms any part of the homestead of the owner. (This item may be deleted if satisfactory evi-

dence is furnished before binder is issued.)

"(b) Improvements have been completed and accepted by the owner.

"(c) All bills for labor and materials have been paid in full and no mechanic's, laborer's or materialmen's liens have attached.

"(d) Restrictions or restrictive covenants have not been violated.

"2. Payment of the full consideration to, or for the account of, the grantors or mortgagors.

"3. Payment of all taxes, charges and assessments levied or assessed against the subject estate or interest, which are currently due and payable.

"4. (Here show outstanding liens or other matters which must be disposed of at or before issuance of policy.)"

Notice that Schedule C concerns itself with showing the requirements to be complied with, thereby contemplating future construction. Schedule C also speaks of liens and encumbrances to be satisfied, again speaking to the future and requiring, in connection therewith, that all bills for labor and material have to be paid in full and that no mechanic's, laborer's or materialmen's liens have attached. After receiving the title binder, what duty or responsibility devolved upon First Federal to inquire about the slabs or improvements placed on the respective lots before and after the dates of the respective title binders? The first title binder was dated August 30th, 1984, at eight o'clock A.M., covering Lot 31, in Block 35, of Dowlen West Unit XXII, and the second title binder was dated October 11th, 1984, at eight o'clock A.M., covering Lot 1, Block 2, of Briar Creek Subdivision. We think these mentioned documents, inter alia, raise serious questions of law concerning their construction and application under this record. These questions of law, we conclude, heavily impact upon the positions of First Federal and Stewart Title and Stewart Title Guaranty. Notice that considerable time passed after the signing of the Deeds of Trust before they were recorded; in one instance, virtually a week elapsed.

*The Borrower's Statements*

Concerning the house and lot at 5390 Timberline, we notice that the total amount of the loan was $85,600.00. The amount advanced on the slab draw was $27,832.00. The survey fee to Guy A. Stonecipher, Jr., was $220.00. There was apparently a mistaken net amount due to the borrower in the amount of $6,285.29, the borrower being John Tiner Homes, Inc. This "Borrower's Statement" contains the following paragraph:

"Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The Lender involved may be furnished a copy of this Statement."

It is unclear, from this record, but the record tends to demonstrate that First Federal received a copy of the Borrower's Statements, which should have put them on notice that John Tiner Homes, Inc., was claiming large net amounts.

On the second Borrower's Statement, concerning Lot 31, Block 35, Dowlen West Unit XXII, we find that the net amount apparently due the borrower was $14,038.00. Under this record, we decide that the payment of these large sums of money to John Tiner Homes, Inc., raised a material issue of fact as to whether the Stewart Companies exercised ordinary care and due diligence in disbursing First Federal's monies. Also raised were material issues as to whether or not the Stewart Companies breached their fiduciary duty. This duty is defined by the Supreme Court in *City of Fort Worth v. Pippen*, 439 S.W.2d 660 (Tex.1969). We quote from *City of Fort Worth v. Pippen, supra*, at 665:

### "LIABILITY OF RATTIKIN

"Rattikin strenuously insists that even if its agent was at fault, since the loss is primarily due to the wrongdoing of the City's own agent, the City is entitled to no recovery (or at least no more than half) because of the rule that one principal cannot recover from another principal

for the fraud of the agents of both principals. *This contention overlooks the fiduciary obligation which Rattikin owed to the City. Rattikin took the City's money to accomplish a purpose directed by the City.* Rattikin was paid a fee for its services and for the careful handling of these funds. *Rattikin therefore owed the City the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it. Rattikin is liable for the breach of its fiduciary obligation, regardless of the fact that the City received exactly what it intended to buy. Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377 (1945). Furthermore, Rattikin is liable for knowingly participating in Hall's abuse of his fiduciary obligation to the City. *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509 (1942).

"Rattikin next argues that the knowledge of Pippen should not be imputed to it, because if Pippen did disburse funds to Hall with knowledge that Hall was to convert them, Pippen was then acting adversely to and in fraud of the principal, Rattikin. While it was not to the interest of Rattikin for Pippen to pay out the funds under those circumstances, the same could usually be said where an agent is guilty of conscious default. It does not necessarily follow that the principal is absolved of liability.

"Rattikin has not undertaken to prove Pippen's motivation as fraudulent collusion between Pippen and Hall, though this would be Rattikin's burden. *Steele v. Butler,* 227 S.W. 506 (Tex.Civ.App., 1921, no writ). But irrespective of the interest of Pippen, his acts in issuing the checks to Hall were done as vice-president of the defendant corporation. *Pippen was completely in charge of these transactions; he prepared the papers and conducted the closings as the sole representative of Rattikin. Rattikin is thus bound by constructive notice of every material fact involved in the transaction and known to Pippen.*

*Wichita Royalty Co. v. City National Bank of Wichita Falls,* 127 Tex. 158, 89 S.W.2d 394, 93 S.W.2d 393 (1935); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60 (1941); *Irvine v. Grady,* 85 Tex. 120, 19 S.W. 1028 (1892); *U.S.F. & G. v. San Diego Bank,* 155 S.W.2d 411 (Tex.Civ.App.1941, error ref'd w.o.m.).

*"The emphasis here should be laid on the fiduciary obligation which Rattikin owed to the City. Pippen's failure to disclose the misapplication of these funds resulted in a violation of Rattikin's duty to the City.* Under those circumstances Rattikin is bound by the knowledge of Pippen even if Pippen is considered as having acted adversely to Rattikin. Restatement, Second, Agency Sec. 282(2)(a) (see illustrations 6 and 8)." (Emphasis added)

We must stress that this is an appeal from the granting of a summary judgment. We want to make it glaringly clear that we do not find that the course of dealings in our case is even remotely similar to the facts in the *City of Fort Worth v. Pippen, supra,* case. There is no evidence in our case of conscious wrongdoing or culpable, criminal misapplication of funds. Nevertheless, our Supreme Court has set out the nature of the duty existing between Rattikin and the City of Fort Worth. Hence, we determine—depending on the facts—that the *Pippen* case (among other cases) speaks to the duties existing between Stewart Companies and First Federal. We do not read the *Pippen* case as holding that First Federal, in our case, had no duty or responsibility to minimize or mitigate its own damages, nor to close its eyes to plainly visible improvements on the ground, if any there were, prior to the time of the filing for record of the deeds of trust, being April 30, 1984, and October 11, 1984, respectively. The deeds of trust were dated August 24, 1984, and October 9, 1984, respectively. Query: Why this long a delay?

At some point in time, should not First Federal, in the exercise of some degree of care, have made inquiry and found out about any unpaid bills concerning the slabs

or any unpaid bills concerning the improvements made after the dates of the respective title binders? It is interesting to note that the record reflects certain mechanic's and materialmen's liens, claims or affidavits by Allied Electrical Contractors, Inc., for $4,490; by Cowboy Concrete Corporation for $7,108.03; by Huber's, Inc., for $5,979.39; by Reed Service Company for $1,869 and $3,738; by Tri-Supply Co. for $5,361.53; by Lone Star Insulators, Inc., for $1,210.50. Several other substantial claims are reflected in the record.

### The Stewart Companies' "No Duty" Contentions

In the Stewart Companies' Motion for Summary Judgment, they averred they had no duty to determine whether any materials had been delivered or labor performed on the property in question. The inescapable query is: When should the Stewart Companies have known about these various lien claimants and what were their duties to First Federal concerning the same, including the later disbursement of monies? And, by similar reasoning, what were the duties of First Federal relevant to these lien claimants vis-a-vis the Stewart Companies?

It is interesting to note that, in the process of the execution of the loan documents on the first interim financing, Earleen Dumatrait, an employee of Stewart Title, undertook to attest to the signatures of the president of the corporate borrower. But it appears that she was not an officer of the corporate borrower. She apparently was not an employee of the corporate borrower.

### The Interpretation of the Interim Construction Binders

Interim Mortgagee's Title Policy Binder[s] on Interim Construction Loans were delivered to First Federal. In each instance, these interim construction binders certified that "a good and indefeasible title" to the lots was vested in John Tiner Homes, Inc., a Texas Corporation, one date being August 30, 1984, at eight o'clock A.M. and the second date, being October 11, 1984, at eight o'clock A.M. Certain closing statements were certified to by Dumatrait, an employee of Stewart Title, acting, inter alia, as escrow agent. These statements and binders were delivered to First Federal showing that certain funds had been disbursed using Appellant's monies, seemingly before the two slab surveys were actually delivered to the Appellant, although the Appellant had actually ordered these same surveys to be made. Query: Was "good and indefeasible title" in John Tiner Homes, Inc.?

### The Escrow Agent's Disbursements

Apparently, on August 24, 1984, and on October 9, 1984, the escrow agent disbursed $45,564.00 and $27,832.00, respectively, to the corporate borrower. The $27,832.00 was described as an "Amount Advanced on Slab Draw". We think, following the summary judgment practice, that this situation raised a material fact issue as to which party would be ultimately responsible for the expenses of the slabs. Since it seems apparent that these slabs would not cost, respectively, $45,564.00 and $27,832.00, we conclude there must have been other bills for material or claims for labor or some probably inchoate mechanic's and materialmen's liens. We determine a material fact issue is raised as well as a question of law concerning which party should stand liable for these amounts advanced on the "slab draws", considering the title binders' certification of "good and indefeasible title".

Under these ambiguous, uncertain, and inconsistent provisions of the closing instructions and the title binders, we think a fact question is raised—necessarily resulting in questions of law—under summary judgment practice as to whether the primary purpose of the business relationship of the parties was to place First Federal in a paramount position as to the lots involved insuring first liens as to any class of adverse claimants.

### The Duty of Loyalty

We decide that an issue of fact was raised as to whether the Stewart Compa-

nies violated a duty of loyalty. Was a duty violated by the Stewart Companies in failing to follow the customary and ordinary usages of the title guaranty business? Should the Stewart Companies have refused to close the iterim loans or pay out later disbursements?

■ But on the other side of the coin, after the letters of transmittal, we also perceive that a fact issue was raised as to what action First Federal should have taken to ascertain what the condition of the construction was and to also ascertain what bills for material and labor were outstanding, if any. Under this peculiar record, we deem that First Federal had a duty to use reasonable, customary care and practices in the ordinary course of its business to either mitigate their damages or avoid later damages. Even though the Stewart Title Company transmitted the slab surveys to the Appellant, these possibly arrived too late to permit First Federal to protect itself as to the liens that had their inception, if any existed, before the recording dates of the Deeds of Trust. After First Federal had *the title binders in its possession, as well as the slab surveys, then material fact issues arise, as well as questions of law, concerning whether Stewart Title Company had a fiduciary duty not to place additional funds of First Federal at risk.* We decide this record raises a material fact issue and a law question as to whether First Federal should have taken reasonable precautions to avoid allowing its additional, later-disbursed funds to be placed at risk.

■ We are able to agree, generally, that, where there is an actual parity of knowledge between a principal and the principal's agents with respect to certain material facts that could be damaging to the principal; nevertheless, the agent is under a duty to act reasonably and prudently and not to recklessly subject the money or other interest of the principal to peril. But, again, we conclude that the principal probably should have acted in such a way as to mitigate its own damages and to see to it that additional funds were not furnished to the agent for later dis-

bursements which caused an additional, substantial loss to the principal.

*An Ultimate Material Issue of Fact*

Luke Brown was employed by Stewart Title Company as a district manager. He testified that his company used an affidavit as to debts and liens and that these affidavits, showing all bills paid for labor, mechanics' and materialmen's claims, were utilized in each transaction. He said that the purpose of these affidavits was to ascertain if there were any debts or claims or liens against the property involved that the title company was not aware of or that were not of record.

Luke Brown further testified that these affidavits were routine documents and a regular part of the closings—both on interim closings and on the permanent loan closings. He further testified that if there were any outstanding bills, even if these were the result of "street talk", then Stewart Title checked it out. Stewart Title, as a firm, general policy, requires a builder to supply a list of his subcontractors. Thereupon, Stewart Title usually calls each one. Brown said that if the title company received information about the *possibility of an outstanding claim or lien,* then the title company undertakes to do something affirmatively about it. If bills come to the title company through the mail or the creditor wants Stewart Title to collect these bills, Stewart Title will try to do so in a manner that "keeps everybody happy." He testified further that it was prudent business policy for Stewart Title to get a "bills paid" affidavit. He further remarked that it was a policy of his company "to flush out the possibility of the existence of work" prior to the interim closing. He testified that, if he had been requested to issue an I.C.B. [Interim Construction Binder] by the lender and if he had found out, in connection with investigating the title, that there could have been some unrecorded liens against the property in question, he would not close the transaction. He answered:

"A If it is a situation like that, I won't close the transaction. It is our policy not to.

"Q Do you then, I presume, notify the lender at once?

"A Typically, yes.

"Q All right, you never go ahead and issue the ICB without having that knowledge?

"A Well, it is not our policy. I'm saying one thing and you are saying another. You say never, it is not our policy to do that.

We must stress that the title company possessed the slab surveys before First Federal.

John Tiner testified that he did not recall any improvements being placed on the lots in question prior to the time of the initial closing. Reviewing the testimony of John Tiner, plus the testimony of Luke Brown, with their reasonable inferences, we decide that a material issue of fact exists as to when the slabs were commenced. This, obviously, is also a crucial if not paramount issue of fact.

*Oriental Hotel Co. v. Griffiths*, 88 Tex. 574, 33 S.W. 652 (1895) has been argued to us in the briefs. We do not reach, at this time, all the issues involved in *Oriental Hotel Co., supra*. This severed cause of action and appeal before us does not include, as parties, any laborers, mechanics, materialmen or suppliers.

We note it is undisputed that First Federal required, for its benefit, an inspection fee of $20.00 as to each tract of land, naming the inspector as one Don Hall. Query: When were these paid-for inspections made for First Federal and what did they disclose?

We deem it of importance to note, in the closing instructions, First Federal required an original mechanic's and materialmen's lien note in the correct amount and a certified copy of a mechanic's and materialmen's lien contract to be signed, executed and filed prior to the start of any construction. This requirement was in cases of homesteads. Surprisingly, no requirement was made by First Federal that the original promissory notes and the original deeds of trust were to be signed, executed and filed for record prior to the start of any construction.

*Earleen Dumatrait's Testimony*

Earleen Dumatrait testified that she was an escrow officer for the Stewart Title Company for a few years. She also had acted as an escrow officer and closer-escrow officer for Security Title Company for about 4½ years prior to her employment with Stewart Title Company. She also acted in the additional capacity as a closer-escrow officer for Stewart Title Company. She described, in some detail, the proper closing of an interim construction loan. She said that Stewart Title Company prepared the closing statement and an affidavit concerning bills, claims and possible liens. She unequivocally identified a document which was used in this case as being a loan application for construction loan addressed to First Federal. Under the "Declarations and Agreements", John D. Tiner, as President of the Borrower, declared in relevant part that there are:

"[N]o outstanding claims, liens or charges against said property whatsoever except as follows:"

No exceptions were shown. This instrument was dated August 10, 1984 *and was attested to by Earleen Dumatrait*—but in what capacity? Did she probably have dual capacities?

By another document, dated August 24, 1984, it is clearly shown that John Tiner claimed an amount due to the borrower of $14,038. On this instrument Dumatrait acted as a closing or escrow agent. On the prior instrument, she apparently attempted to act as a corporate attesting officer, either as a secretary or assistant secretary for John Tiner Homes, Inc. Importantly, the record shows an affidavit wherein John D. Tiner swore, concerning the lots in question:

"[T]hat *he personally knows that all bills for materials furnished and labor performed* in connection with such construction *have been fully paid.*

"The statements herein made are *made wholly from facts within my knowledge,* and I knowing that First Federal Savings and Loan Association of Beaumont relying wholly on the facts

herein contained, *otherwise the loan now being made by them to John Tiner would not be consummated.*" (Emphasis added)

The affidavit· is dated and sworn to on August 24, 1984, and on that affidavit Earleen Dumatrait acts as a Notary Public. Query: Is there a conflict of interest? These written documents, executed by John Tiner, both individually and as president of his corporation, are definitely contrary to the position taken by First Federal. Hence, a material issue of fact exists as well as crucial and intriguing questions of law.

### Questions of Law

Depending on the jury's or bench's fact findings, after a trial on the merits, it can be determined whether the inception of the mechanics' liens are governed by *TEX. PROP. CODE ANN. sec. 53.124(a)(1)* or *sec. 53.124(a)(2)* (Vernon 1984); that is, the initial starting of the work or the recording of the Deeds of Trust.

Whether the commencement of construction of improvements or delivery of materials to the lots involved occurred first or the recordings of the Deeds of Trust were first, raises important questions of fact and law. *TEX. PROP. CODE ANN. sec. 53.-124(a)(1)(2). Coke Lbr. & Mfg. Co. v. First Nat. Bank, Etc.,* 529 S.W.2d 612 (Tex.Civ. App.—Dallas 1975, writ ref'd).

The Deed of Trust liens or mortgages, if recorded prior to the inception of the mechanics' liens, did not become subordinate to the mechanics' liens. *Diversified Mortg. v. Lloyd D. Blaylock, Etc.,* 576 S.W.2d 794 (Tex.1978); *Irving Lumber Company v. Alltex Mortgage Company,* 468 S.W.2d 341 (Tex.1971).

On the other hand, if the inception of the mechanics' liens, by virtue of the slabs, was prior to the recordation of the Deeds of Trust on the properties, then the Deeds of Trust liens are inferior and junior. The mechanics' liens would remain senior and superior. *Diversified Mortg., supra.* Query: Between First Federal and the Stewart Companies, do all the properly perfected mechanics' liens "relate back" to a

time referred to as the "inception" of such liens. *Oriental Hotel Co., supra; Pierce v. Mays,* 277 S.W.2d 155 (Tex.Civ.App.—Amarillo 1954), *argued on other grounds,* 154 Tex. 487, 281 S.W.2d 79 (1955). But see *McConnell v. Mortgage Investment Co. of El Paso,* 157 Tex. 572, 305 S.W.2d 280 (1957). Further query: Does the "relation back" doctrine apply to bills, claims, liens, and charges for material furnished and labor performed after the Deeds of Trust were recorded as between these parties to this appeal?

See L. Kelly Jones, *Mechanic's and Materialmen's Lien Laws: Guide Through the Maze,* 48 TEX.B.J. 318 (1985).

■ Of importance is the case of *Richard H. Sikes, Inc. v. L & N Consultants,* 586 S.W.2d 950 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e., *appeal after remand* 648 S.W.2d 368, writ ref'd n.r.e.). The *Sikes* case, *supra,* holds to the effect that a valid deed of trust lien existing upon a tract of land, yet prior to the time of an inception of a mechanic's lien, does not become subordinate and inferior to the said mechanic's lien. *See Cisco Banking Co. v. Keystone Pipe & Supply Co.,* 277 S.W. 1060 (Tex. Comm'n App.1925, judgmt adopted); *Tomlinson v. Higginbotham Bros. & Co.,* 229 S.W.2d 920 (Tex.Civ.App.1950, no writ). A deed of trust executed and recorded subsequent to a mechanic's lien would not impair that lien inasmuch as the mechanic's lien would take priority over the deed of trust lien. *Mutual Building & Loan Ass'n v. McGee,* 43 S.W. 1030 (Tex.Civ.App.—Houston 1898, no writ).

### The Equitable Subrogation Doctrine

There is some evidence in the record that a part of one of the interim payments, based on the slab survey, was to discharge a prior vendor's lien. Hence, First Federal, as to that amount of money, to pay a prior vendor's lien, would probably stand in the shoes of the owner and holder of the vendor's lien by the doctrine of equitable subrogation. *See Hubert Lumber Co. v. King,* 468 S.W.2d 503 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.); *Home Savings Ass'n v. Southern Union*

*Gas Co.,* 486 S.W.2d 386 (Tex.Civ.App.—El Paso, 1972, writ ref'd n.r.e.); *Yeager Elec. & Plumb. Co., Inc. v. Gaines Building, Inc.,* 492 S.W.2d 921 (Tex.Civ.App.—Corpus Christi 1973, no writ).

### Schedule B of the Interim Construction Title Binder

Schedule B provides that certain requirements be complied with and defects and objections be eliminated and liens and encumbrances be satisfied and discharged of record before the permanent policy of title insurance will issue. Also, there must be evidence satisfactory to the company (Stewart Title Guaranty Company) that all improvements have been completed and accepted by the owner and that all bills for labor and materials have been paid in full and that no mechanic's, laborer's or materialmen's liens have attached. First Federal could not close its eyes to Schedule B. Section Two of Schedule B specifically provides, in its subsection No. 6, as follows:

> "In the event a Mortgagee Policy is issued prior to the improvements having been completed and accepted by the owner, and before satisfactory evidence that all outstanding bills have been paid or satisfied has been furnished to the Company issuing said Mortgagee Policy, an additional exception will be inserted under Schedule B of said Mortgagee Policy, excepting to 'completion of improvements', as well as 'pending disbursements' (if applicable), the wording of said exception being as promulgated by the Texas State Board of Insurance and specifically set out as Rule P8b3 in the Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas."

We conclude that a case of significant importance is *Coke Lbr. & Mfg. Co. v. First Nat. Bank., Etc.,* 529 S.W.2d 612 (Tex.Civ. App.—Dallas 1975, writ ref'd). In an excellent, well-written opinion, Chief Justice Guittard wrote:

> ### "1. Liability for Advances after Notice of Lien
>
> "Plaintiff contends that an interim lender advancing funds to a builder for a construction project is in the position of a trustee and has a duty to suppliers of labor and materials to see that their claims are satisfied before advancing any further funds to the builder, particularly if it has notice of claims past due and unpaid. This contention is urged as a question of first impression since, admittedly, no authority can be found to support it.
>
> "We find no basis for imposing on the lender the duty of a trustee. Plaintiff had both actual and constructive notice of the bank's superior lien when it supplied the materials in question, yet it made no inquiry of the bank concerning disbursement of the proceeds of the loan until the builder failed to pay. If plaintiff was not satisfied to rely on the builder's credit, it could have demanded cash on delivery or insisted on some other assurance of payment. It was not justified in relying on the bank to protect its interest. Any such protective action would have imposed on the bank the burden of evaluating the possibly disputed claims of materialmen and subcontractors although the bank had promised only to advance money to the builder. Consequently, we hold that the bank has no liability to plaintiff for advancing funds to the builder after notice of plaintiff's claim.
>
> ### "2. Priority of Liens
>
> "Plaintiff's contention rests on the further claim that its materialman's lien was prior to the bank's deed of trust with respect to advances made by the bank with actual notice of plaintiff's materialman's lien. Such priority is asserted notwithstanding the provision in the bank's deed of trust that it secures 'all loans and advances which Bank may hereafter make to the Grantor.' The only case plaintiff cites as supporting this contention, even by way of dictum, is *Regold Manufacturing Co. v. Maccabees,* 348 S.W.2d 864 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.). That case involved priority as between a materialman's lien and a secured interim loan for

future advances, but the court held only that a lender who advances money in reliance on an earlier deed of trust without notice of the materialman's claim is entitled to priority. Plaintiff argues that by implication a lender who advances money with actual notice of a materialman's claim is not entitled to priority.

"We cannot accept this implication as sound. In our view, actual notice to the lender of the materialman's claim can give the materialman no greater rights than the constructive notice effected by filing his affidavit. Constructive notice resulting from a statutory filing is as effectual and binding as actual notice. *Hexter v. Pratt,* 10 S.W.2d 692, 693 (Tex. Comm'n App.1928, jdgmt. adopted); *University State Bank v. Gifford-Hill Concrete Corp.,* 431 S.W.2d 561, 571 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.). Consequently, the question presented is whether a deed of trust to secure future advances, if filed before a materialman begins delivery of materials, is prior to the materialman's lien with respect to advances made with notice, actual or constructive, of the materialman's lien. We hold that in this situation the deed of trust is prior. *Freiberg v. Magale,* 70 Tex. 116, 7 S.W. 684, 685 (1888); *Crabb v. William Cameron & Co.,* 63 S.W.2d 367, 368 (Tex.Comm'n App.1933, jdgmt. adopted); *Poole v. Cage,* 214 S.W. 500, 502 (Tex.Civ.App.— Galveston 1919, writ ref'd); *Willis v. Sanger,* 15 Tex.Civ.App. 655, 40 S.W. 229, 232 (San Antonio 1897, writ ref'd).

"In the present case, even in the absence of an express provision concerning future advances, the result would be the same because the advances made after notice of the materialman's lien, when added to the advances previously made, still did not exceed the principal amounts of the notes described in the deeds of trust. Thus plaintiff had express notice that each deed of trust was given to secure the full amount of the builder's indebtedness to the bank, including subsequent advances. *Foxworth-Galbraith Lumber Co. v. Southwestern Contracting Corp.,* 165 S.W.2d 221, 224 (Tex.Civ.

App.—Fort Worth 1942, writ ref'd w.o. m.)."

Guittard's holding, in briefer form, is as follows:

"This case presents the question of whether an interim lender is liable to a materialman for the amount of a claim for materials furnished to a builder on the ground that the lender, after receiving actual notice of the materialman's claim and lien, advanced funds to the builder in excess of the amount of the claim. We hold that the lender has no such liability. We also deny the materialman's claim for priority of its lien as against the lender's deed of trust securing subsequent advances, and we sustain the power of the trustee named in the deed of trust to sell the land on default of payment of indebtedness other than that specifically described in the deed of trust."

Under this case, if the fact finder below finds that First Federal's deed of trust was actually filed for public record before the slabs were commenced or before any other permanent improvements that were ultimately incorporated into the houses were commenced then their deeds of trust liens are first and superior to the mechanics' or materialmen's liens that had their inception subsequent to the recording dates of the two deeds of trust.

 If, however, on the other hand, the mechanics, materialmen, craftsmen, and laborers, in our case, actually started, in a visible way, the slabs which apparently—though not conclusively—seemed to have been put in place and completed as much as a week prior to the time that First Federal's deeds of trust liens actually were recorded in the public records, then they have priority. And, under the so-called "relation-back theory", it has been argued by eminent, scholarly writers that the Texas courts have almost uniformly held that, for the purposes of determining lien priorities, each contractor or subcontractor or any holder of a valid mechanic's or materialman's lien attaches to the improved property at a time called "the inception of lien". *TEX. PROP. CODE ANN. sec. 53.154* (Ver-

non 1984). See, generally, Jones, *Texas Mechanics' and Materialmen's Lien Laws: A Guide Through the Maze*, 48 TEX.B.J. 318, 324 (1985). Furthermore, the inception of these mechanics' and materialmen's liens occur at the earliest time of three different events: (1) the visible commencement of actual construction of improvements upon the relevant property, which said improvements are ultimately incorporated or made a part of the finished improvements; (2) the delivery of visible materials to the relevant property provided that the visible materials are actually used in the permanent improvement and not merely for some temporary use, such as a temporary telephone pole or a temporary batter board, or (3) the public recordation of a written construction contract or sworn affidavit evidencing an oral construction contract. See also *Irving Lumber Company v. Alltex Mortgage Company*, 468 S.W.2d 341 (Tex.1971). Ordinarily, in determining the inception of a mechanic's or materialman's lien, the same is fixed at the inception of the first lien which occurs either with the actual commencement of construction of improvements or delivery of material to the land upon which the improvements are to be located for use thereon and for which a lien results; provided, of course, that such commencement of the work or material placed thereon is actually visible from an inspection of the land. *Diversified Mortg. v. Lloyd D. Blaylock, Etc.*, 576 S.W.2d 794, 801–802 (Tex.1978). In *Diversified Mortgage Investors, supra,* the court wrote:

"This court does not place reliance solely upon a 'visibility' standard to determine the inception of mechanic's liens under Article 5459. Article 5459, when read in conjunction with the other statutes governing mechanic's liens, clearly provides additional standards or conditions which must exist before a mechanic's lien is incepted. Article 5459, Section 2(a), specifies two categories of activities which delineate the inception of a mechanic's lien: (1) the actual commencement of construction of the improvements; or (2) the delivery of material to the land upon which the improvements

are to be located. This court must construe these provisions of the statute in order to determine what types of activities these inception-creating categories entail."

The court concluded:

"... a valid interpretation of Article 5459, which requires the '*actual* commencement of construction of the improvements.' This court interprets the term 'actual' as to require the placing of something of permanent value on the land, as opposed to preliminary or preparatory activities or structures. Therefore, under most circumstances, the commencement of construction of the improvements in the form of a building or a structure must entail the excavation for or the laying of the foundation. Accordingly, under the commencement of construction category in Article 5459, the inception of the mechanic's and materialman's lien occurs only when the activity: (1) is conducted on the land itself; (2) is visible upon the land; and (3) constitutes either (a) an activity which is defined as an improvement under the Texas statute or (b) the excavation for or the laying of the foundation of a building or a structure."

We think that the slab structures are an activity which is an improvement. They encompass an excavation for, or the laying of, a foundation of a building or a structure, without which the building or structure cannot begin to exist. *Diversified Mortgage, supra.*

And, although the matter is not totally free from doubt, we deem that the relation-back doctrine applies to mechanics' and materialmen's liens that were actually performed or supplied after the date of the recording of the respective deeds of trust, provided the slabs were in place under the commencement of work rule. *Oriental Hotel Co. v. Griffiths*, 88 Tex. 574, 33 S.W. 652 (1895). *TEX. PROP. CODE ANN. sec. 53.121, sec. 53.122, sec. 53.123,* and *sec. 53.124* (Vernon 1984). *Tomlinson v. Higginbotham Bros. & Co.*, 229 S.W.2d 920 (Tex.Civ.App.—Eastland 1950, no writ); *But see McConnell v. Mortgage Invest-*

*ment Co. of El Paso*, 292 S.W.2d 636, 638 (Tex.Civ.App.—El Paso 1955), where the El Paso court wrote:

"It is clear at the outset that certain work had started on the project before plaintiff's Deed of Trust was executed. It has been held repeatedly that the liens of materialmen and laborers are superior to any mortgage created after the work has begun, and that all such liens shall be on an equal basis, whether by materialmen or laborers, so long as they are for work done or material supplied for the erection or completion of the building. It has also been established that each lien thereby properly created shall be equal to all other such liens, regardless of inception—that is, the lien for he who completes the last bit of building is equal in time and dignity to the lien of he who has labored on the erection of the same, the courts holding that all the liens have their inception at the same time, to-wit, the beginning of of the erection or construction . of the building or buildings, and that all of said liens are superior to any mortgage executed after the erection of the building is begun. . . ."

The Supreme Court of Texas reviewed the case of *McConnell v. Mortgage Investment Co. of El Paso,* 157 Tex. 572, 305 S.W.2d 280 (1957). The Supreme Court wrote:

"As to the doctrine of 'relation back', the Court in the Tomlinson case said, 'The law is well settled that while a building is under construction, any person who takes a mortgage thereon does so with notice of any mechanics' or materialmen's liens. It is his duty to make inquiry as to whether or not *labor has been performed or material furnished* within the statutory period for filing liens for which payment has not been made.' (Italics supplied). The case does not hold that in the absence of a general contract between an owner and a contractor, mechanics' or materialmen's liens for labor or materials furnished *after* the date of a deed of trust would nevertheless take priority over such contractual lien." (Emphasis theirs)

The Appellees candidly concede that that part of the holding of the *McConnell* case, in the Supreme Court, which has been cited for the proposition that the priority position of a mechanics' and materialmen's lien cannot be "related back" to premortgage work, for which full payment has been made, is not sound. Thus, we perceive that the failure of recent legislatures to codify the *McConnell* exception to the "related back" doctrine has sounded its death knell.

### The Different Schedules B

Part 1 of SCHEDULE B shows the title binder requirements to be complied with, the objections and defects to be removed or eliminated, and the liens and encumbrances to be satisfied and discharged of record before the final policy of title insurance will be issued. Part 1 has to do with evidence satisfactory to the company that: (a) (has to do with a homestead situation not here involved.) The only other requirements are: (b) (—bear in mind that SCHEDULE B, itself, speaks to the final consummation of the permanent policy of title insurance and (b) says:) "Improvements have been completed and accepted by the owner"; (c) All bills for labor and materials have been paid in full and no mechanic's, laborer's or Materialmen's liens have attached", and "(d) Restrictions or restrictive covenants have not been violated." And, "2. (Here show outstanding liens or other matters which must be disposed of at or before issuance of policy.)" Absolutely none are shown on either binder.

Now SCHEDULE B–Part 1 of the other binder is much different and does include this phrase:

"6. In the event a Mortgagee Policy is issued prior to the improvements having been completed and accepted by the owner, and before satisfactory evidence that all outstanding bills have been paid or satisfied has been furnished to the Company issuing said Mortgagee Policy, an additional exception will be inserted under Schedule B of said Mortgagee Policy, excepting to 'mechanic's and

materialmen's liens', as well as 'pending disbursements' (if applicable), the wording of said exception being as promulgated by the Texas State Board of Insurance and specifically set out as Rule P8b3 in the *Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas.* "

And this language may offer some protection to the title guaranty company concerning Lot 31, Block 35, of the Dowlen West Unit XXII, but they have failed to include any such protective language concerning Lot 1, Block 2, of the Briar Creek Subdivision, Section 1, to the City of Beaumont. In fact, correctly stated, they simply have no "Part 1" of SCHEDULE B at all. Certainly, there needs to be a proper legal construction, at the trial level, of the title policy binder on interim construction loan as it differs as between these two lots and the different language used in the SCHEDULE Bs.

Heretofore, we have set out the strict, rigorous wording used by John Tiner in his affidavits that all bills for materials and labor have been fully paid. We deem it fitting to cite *TEX. PROP. CODE ANN. sec. 53.026* (Vernon 1984) concerning penalties for certain false statements. Generally, *sec. 53.026,* subsections *(b) and (c),* provide that, under certain circumstances, a misdemeanor offense is committed and punishable by a fine of not less than $100.00 nor more than $5,000.00; confinement in the county jail for not more than one year; or both.

We perceive a number of crucial fact issues which, in turn, give rise to a fair number of crucial and paramount issues and questions of law. Therefore, the whole case is reversed and remanded for a full trial on the merits.

REVERSED AND REMANDED.